### STATE OF CONNECTICUT v. MARSHALL T. HOLLOWAY
### (AC 29075)

DiPentima, Lavine and Hennessy, Js.

---

"A. Yes."

Argued April 17—officially released September 8, 2009

*Katherine C. Essington*, special public defender, for the appellant (defendant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Joseph J. Harry*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, Marshall T. Holloway, appeals from the judgment of conviction, rendered after a jury trial, of two counts of interfering with an officer in violation of General Statutes § 53a-167a.[1] On appeal, the defendant claims that (1) the trial court improperly denied his *Batson*[2] challenge, (2) the court improperly

---

[1] The defendant also was charged with and subsequently found not guilty of four additional charges: sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (3), reckless endangerment in the first degree in violation of General Statutes § 53a-63 and unlawful restraint in the first degree in violation of General Statutes § 53a-95.

[2] *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

denied his motion for a mistrial, which was based on his claim of judicial bias and (3) he was deprived of his right to due process as a result of prosecutorial impropriety.[3] We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early morning hours of September 11, 2005, two Bridgeport police officers responded to a call reporting an abduction. The caller reported that her sister might be in trouble. The officers went to the sister's home, where they found the woman to be upset and "visibly shaken." She reported that she had been sexually assaulted by the defendant and directed officers to the defendant's location. Five members of the Bridgeport police department responded to a police radio call to the corner of Pembroke Street and Stubin Street in Bridgeport and found the defendant, who appeared to be sleeping, in the driver's seat of his van. The officers attempted to wake him by tapping on the window several times and identifying themselves as Bridgeport police officers. One officer entered the van through the unlocked rear sliding door of the van and unlocked all of the doors. The officers then opened the driver's side door and continued to attempt to wake the defendant. The defendant woke up and tried to push through the officers and flee from the scene. The officers attempted to detain the defendant, but he was "struggling, resisting [and] fighting," and was being "combative." The defendant continued to fight and attempted to bite the officers. Officer Chris Robinson

---

[3] Although the defendant uses the term "prosecutorial misconduct" throughout his brief, we note that our Supreme Court has stated that "[t]he use of the term prosecutorial impropriety, when reviewing allegedly improper statements by a prosecutor at trial, is more appropriate than the traditional term of prosecutorial misconduct . . . . " (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 26 n.2, 917 A.2d 978 (2007).

used pepper spray in an effort to incapacitate the defendant. Eventually, the officers handcuffed the defendant and placed him under arrest.

Following a jury trial, the defendant was convicted of two counts of interfering with an officer. The court sentenced the defendant to a total effective term of two years incarceration, suspended after one year, and three years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim is that the court improperly denied his *Batson* challenge. Specifically, he argues that the court improperly permitted the state to exercise a peremptory challenge and to remove an African-American venireperson, S,[4] from the jury.[5] We disagree.

To evaluate the defendant's claim, we begin by setting forth the relevant legal principles and the standard of review. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting

[4] References to venirepersons will be made by use of initials to protect their legitimate privacy interests. See, e.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

[5] The defendant also claims in his brief that the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race on the day that S was excused and that the "only two peremptory challenges exercised by [the prosecutor on the day in question] were used to exclude African-American venirepeople." The record reveals, however, and the defendant conceded at oral argument before this court, that there were four peremptory challenges utilized by the state on that day and that only two of the four were to prospective jurors who have been identified as African-American. The other African-American venireperson who was peremptorily challenged by the prosecution, J, had a prior arrest for domestic violence, which the prosecutor raised in response to a *Batson* challenge. J's removal as a venireperson is not at issue on this appeal. The races of the other two prospective jurors who the state challenged on the same day are not reflected in the record, and no *Batson* challenges were raised as to those two venirepeople.

a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged

juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. . . . As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State v. Monroe*, 98 Conn. App. 588, 590–92, 910 A.2d 229 (2006), cert. denied, 281 Conn. 909, 916 A.2d 53 (2007); see also *State v. Holloway*, 209 Conn. 636, 643, 553 A.2d

166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

During voir dire, the prosecutor and defense counsel both questioned S. Both the defendant and S are African-American. The state exercised a peremptory challenge to remove S. The defense raised a *Batson* challenge.[6] The prosecutor responded that he was exercising his challenge on the basis of two reasons: (1) S had been a sexual assault victim more than twenty years ago and had never reported the alleged crime and (2) the possibility that S's deep religious faith could cloud her judgment. Defense counsel responded that the proffered reasons stated by the prosecutor were not valid and that the defense was convinced that she was a fair minded person.[7] The court found that there was a legitimate, nonracial reason for the state to excuse S.[8]

On appeal, the defendant argues that neither of the neutral reasons articulated by the state in support of its peremptory challenge was sufficient to overcome the *Batson* challenge.[9] Our Supreme Court has held that

[6] The following colloquy occurred:

"[Defense Counsel]: Your Honor, I note that this was a black female juror, and she seemed to be answering the questions—

"The Court: Just get to the point . . . .

"[Defense Counsel]: I would raise a *Batson* issue, Your Honor—

"The Court: All right.

"[Defense Counsel]: with reference to this juror."

[7] At this point, the burden of persuasion rested on the defense to demonstrate to the court that the state purposefully discriminated against this potential juror. *State* v. *Hamlett*, 105 Conn. App. 862, 878, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008).

[8] Specifically, the court stated: "I find there is a legitimate reason for the state to excuse [S]. . . . Legitimate, nonracial, I should say for the record."

[9] First, the defendant argues that the reasoning that S had been a sexual assault victim is "dubious at best" because it would appear to be a desirable factor for the prosecution and the state's questioning of S was "perfunctory." Second, the defendant argues that the state's other reason for excusal, that S's deep religious faith might cloud her judgment, does not survive close scrutiny under Connecticut law. The defendant concludes, therefore, that both reasons offered by the state were pretextual.

it need not review all of a prosecutor's reasons given in support of his or her preemptory challenge once it concluded that one of the reasons articulated was race neutral. *State* v. *Hodge*, 248 Conn. 207, 223, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); see also *State* v. *Smith*, 222 Conn. 1, 14 n.8, 608 A.2d 63 ("[b]ecause we have concluded that the state's concern about [the venireperson's] arrest record was a neutral ground for excusing him from the jury, which was adequately supported by the record, we need not address [the] other claim"), cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Gonzalez*, 206 Conn. 391, 405, 538 A.2d 210 (1988) ("[b]ecause we conclude that either of these reasons was a valid basis for challenging [a venireperson], we do not consider the other reasons advanced by the state"). In the present case, we assume that the court found both reasons submitted by the prosecutor to be legitimate, race neutral reasons for exercising a peremptory challenge.[10] We begin, therefore, by considering the first reason offered by the prosecutor in support of his preemptory challenge of S, that is, her status as a prior victim of a sexual assault.

During voir dire, S stated that she believed that the way a woman dressed could invite a violent assault.

---

[10] The record is unclear as to the basis of the court's rejection of the defendant's *Batson* claim. The defendant failed to seek an articulation of the court's decision. "It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter." (Internal quotation marks omitted.) *Sander* v. *Sander*, 96 Conn. App. 102, 112–13, 899 A.2d 670 (2006). We may presume, in the absence of a more complete record, that the court undertook the proper analysis of the law and of the facts in reaching its conclusion. See, e.g., *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 72, 752 A.2d 1037 (1999). We therefore assume that the court accepted both of the neutral reasons offered by the prosecutor for challenging S.

She explained that she believed this because "the life-style that I used to live, I know I blame myself for a lot of the things that happened to me because, you know, being at the wrong place, the wrong time, you know, so—you know, it was—I put myself in that pre-dicament." In response to further questioning by the prosecution, S admitted to having been sexually assaulted thirty-six years before, but that she never reported the crime. Regarding this unreported sexual assault, S stated, "I was in the wrong place, doing the wrong things," and admitted that she did not call the police to report the sexual assault because "I felt that I was at fault, you know, because I was not—I was doing something that was not right . . . ."

S did indicate that she believed that she could be fair in assessing the facts in the trial. Defense counsel then asked S: "Do you think that just because a woman makes an accusation that results in an arrest for sexual assault that she must be telling the truth?" S responded: "No, I do not, because I have seen a lot of times, you know, and have known for a fact—not that the woman deserved it. I do not think anybody deserved to be hurt, *but I know for a fact that that person, you know, put their self in that place.*" (Emphasis added.) Finally, S indicated that she had worked with female sexual assault victims through her religious ministry, the majority of whom, in her opinion, "were in the wrong place at the wrong time, doing the wrong thing."

We conclude that S's experiences and beliefs resulting from her having been a victim of sexual assault constituted a neutral ground for the state's peremptory challenge. The defendant contends that because S's history of sexual assault makes her a more desirable venireperson for the state, the court should have found this reason to be pretextual. We are not persuaded.

S's failure to report the crime and her statements regarding the personal responsibility of victims of sexual assault created a reasonable basis to believe that she may be an *undesirable* juror for the prosecution. Although S stated that she believed that she could be fair, "a prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters." *State* v. *Hodge*, supra, 248 Conn. 231; see also *State* v. *Hinton*, 227 Conn. 301, 326–27, 630 A.2d 593 (1993) ("[t]he fact that a prosecutor distrusts a juror or finds [the juror's] responses not to be credible [may] be a sufficiently race-neutral reason for using a peremptory challenge" [internal quotation marks omitted]); *State* v. *Smith*, supra, 222 Conn. 14–15 (venireperson's assessment of his or her own prejudices may be untrustworthy for variety of reasons).

Furthermore, although the prosecutor's questioning of S was not extensive, it was not "perfunctory." The totality of S's statements, in response to questioning by both the prosecutor and the defense attorney, formed a reasonable basis to accurately assess her ability to serve as an impartial juror. Therefore, we conclude that the state's first proffered reason for removing S as a juror was not discriminatory. Accordingly, the court properly denied the defendant's *Batson* challenge with respect to S.[11]

II

The defendant's second claim is that the court improperly denied his motion for a mistrial, which was based on his claim of judicial bias. Specifically, he claims that the court improperly interfered with defense counsel's cross-examination of witnesses and presentation of evidence, and criticized defense counsel to such

---

[11] We therefore need not address the defendant's claim regarding S's "deep religious faith."

a degree as to imply that the defendant's case lacked merit. We disagree.

As a preliminary matter, we set forth the legal principles that govern our resolution of the defendant's claim and the applicable standard of review. "The standard to be employed [for a claim of judicial bias] is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification." (Internal quotation marks omitted.) *State* v. *Bunker*, 89 Conn. App. 605, 612–13, 874 A.2d 301 (2005), appeal dismissed, 280 Conn. 512, 909 A.2d 521 (2006).

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . In [our] review of the denial of a motion for mistrial, [we recognize] the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors.

. . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *State* v. *Peloso*, 109 Conn. App. 477, 497–98, 952 A.2d 825 (2008).

After completion of the trial, defense counsel moved for a mistrial on the basis of judicial bias. He argued in support of the motion that the court had made comments throughout the trial that created a bias and undermined the credibility of the defense by suggesting to the jury that the court believed that the "defense is somehow not doing its job or taking too much time" and that the court had "taken a position with reference to the defense . . . ." The prosecutor responded that "the court has gone out of its way toward defense counsel to present the case over the state's objection" and argued that "[t]he court has never made a comment that would indicate its position one way or another." The court responded to the motion at length, stating that the reasons defense counsel raised in his motion were "inadequate" and that any comments directed at defense counsel were in response to the mismanagement of the defense and counsel's "constant delay in asking the questions," which previously had been addressed outside the presence of the jury. The court also referred to a curative instruction delivered to the jury earlier in the trial in response to the only objection that defense counsel made regarding the court's actions.[12]

---

[12] On the fifth day of trial, at the conclusion of cross-examination of a witness, the court asked some additional, follow-up questions. Later, outside the presence of the jury, defense counsel expressed worry that the questions by the court may suggest an adoption of some of the testimony of the witness.

Immediately upon the jury's reentering the courtroom, the court gave the following instruction: "Before [the prosecutor] calls his next, and I believe his final, witness, I just want to make an observation. When [police Officer Adrian] Elem was on the [witness] stand and I asked him a couple of questions, I referenced in my questioning some of the testimony that was already given to you. I just want to emphasize that whether I ask a question or the attorneys ask a question, it's not evidence, it's a question. So, if the question includes a statement, the statement is not evidence.

On appeal, the defendant claims that the court improperly denied his motion for a mistrial. Although the defendant conceded during oral argument before this court that the trial court never directly opined on the merits of the case, he contends that the court implicitly communicated to the jury, by means of its statements and actions, that the defendant's case did not have merit.

A review of the record reveals that the court repeatedly directed comments to defense counsel in an effort to manage the trial. The court told counsel many times to "cut to the chase" and to "move along," and at one point, in the presence of the jury, suggested that the jurors would fall asleep due to the long delays of defense counsel on cross-examination. In the vast majority of the instances in which the court directed counsel to "move along," however, it was in response to a sustained objection. The court rarely independently interrupted or interfered in cross-examination, and when the court did interrupt, it was only for the purpose of clarification. Further, the record reflects several instances, both within and outside the presence of the jury, when both the court and prosecutor questioned the speed at which defense counsel presented his questions to witnesses. In fact, on the second day of trial, *outside the presence of the jury*, the court directly addressed defense counsel regarding his "tremendous pauses" when questioning witnesses. The following colloquy occurred:

"The Court: Do you know that when you ask questions of witnesses, you take an unreasonably long

"More importantly, under no circumstances am I to suggest or infer in any way, shape or form that by asking the question and referencing the evidence and bolstering the credibility of the witness I'm not adopting the testimony. I'm not accepting the testimony. I simply referenced it in asking him about whether or not the defendant, at the time that he was at the scene, asked any question—or made any statements that the officer could have recalled. I just want to make that observation for you."

amount of time in delays and pauses, which wastes court time, jury time, and the time we have within which to try this case? Do you know that?

"[Defense Counsel]: I—I did not know that, Your Honor. I thought that—

"The Court: Well, then let me bring it to your attention because I do not want to put you on the spot. You take too long in asking questions. I presume that you have prepared your questions as a good trial lawyer that you are known to be. I presume that you know what questions you are going to ask and where you are going to dwell, but you take so long. . . . [I]t is unreasonably long, and you are losing the attention span of the jury and you are wasting time. And . . . if you can correct that, I want you to correct it. I really do, I am serious. This is not something to take [lightly]. . . . This is not the way a case should be tried unless there is a legitimate, valid reason. I mean, the only other reason is that you are not prepared, and I know you are prepared. And I know you want to do a good job for your client, but I have to bring it up. It is very difficult. And it is more importantly a waste of time. So, I am instructing you to make an adjustment so that you can ask the questions without these long delays. . . . I have addressed it, I want you to adjust it because there is no reason for it and it is just a waste of time. It is an unreasonable waste of time. It is a waste of your time, your client's time, the court's time, the staff's time, the jury's time, and I will not allow it."

Later, the court noted that defense counsel had demonstrated that when necessary, he was able to ask questions at a much faster pace and directed him to continue to do so in an attempt to better manage time.

The defendant refers to *State* v. *Gionfriddo*, 154 Conn. 90, 221 A.2d 851 (1966), in support of his claim that the court abused its discretion in denying his

motion for a mistrial. In *Gionfriddo*, during a trial before the court, the court interfered in the questioning of witnesses, and our Supreme Court concluded that the court did "assume the role of an adversary" for the state throughout the trial. Id., 96. Our Supreme Court observed in *Gionfriddo* that "[t]he judge interrupted and chastised counsel a great number of times during the critical phases of the trial. These repeated interruptions and rebukes of counsel . . . could only have the effect of repressing counsel's attack on the credibility of the witnesses and of giving aid and advice to the witnesses." Id., 97. Noting that the "denial of the right of cross-examination or undue interference by the court in the conduct of that examination may seriously curtail the legitimate and proper defense of one charged with the crime," our Supreme Court ordered a new trial on the basis of "all of the instances [of statements and attitude which would tend to deny the defendant a fair trial] throughout this trial, the absence of corroboration and the closeness of this case . . . ." Id., 96–97.

In addition, the defendant refers to *United States* v. *Coke*, 339 F.2d 183 (2d Cir. 1964), throughout his reply brief and oral argument, in support of his argument. In *Coke*, the defendant claimed that the trial judge displayed an attitude of partisanship that resulted in the denial of a fair trial through "excessive interference in the examination of the witnesses, by repeated rebukes and disparaging remarks . . . and by marked impatience, all in the presence of the jury . . . ." Id., 185. The United States Court of Appeals for the Second Circuit found that "the comments of the trial judge were of such a nature that, in the context in which they were made, they must have improperly prejudiced the defense in the minds of the jurors." Id. The court characterized the comments as "caustic and disparaging," and opined that they "undoubtedly gave the jury the impression that the defendant's case was of little substance

and was not worthy of very much attention." Id. The court in *Coke*, however, did not cite a single specific statement or instance of these comments, and, therefore, this case is not of much guidance. Nonetheless, a review of the record in the present case leads us to conclude that the court's statements made in the presence of the jury did not create an excessive interference and, consequently, did not prejudice the defendant.

We find *State* v. *Gordon*, 197 Conn. 413, 426, 504 A.2d 1020 (1985), to be applicable to the facts of this case. In *Gordon*, our Supreme Court concluded that the trial court's actions, while questionable, did not deny the defendant a fair trial. In reaching its conclusion, the Supreme Court noted that the record was replete with instances of argumentative conduct toward defense counsel. Id., 425. The court reasoned, however, that the trial court's allegedly improper treatment of defense counsel did not thwart defense counsel's ability to defend his client, as counsel zealously argued numerous motions, fully cross-examined all witnesses and was not constrained in his attempts to have evidence admitted or in his ability to object to actions of the prosecutor. Id., 426; see also *United States* v. *Pisani*, 773 F.2d 397, 403 (2d Cir. 1985) (although some of trial court's comments and behavior toward defense counsel were regrettable, they did not convey impression of partiality toward government to such extent that it became factor in jury deliberations). As in *Gordon*, the court here "took no position of advocacy regarding the outcome of the case, and made no improper comments on the significance of the evidence presented. At no time did the [court] convey to the jury [its] opinion as to the guilt or innocence of the defendant." *State* v. *Gordon*, supra, 425–26.

In this case, the court's response to defense counsel's questioning arguably was more emphatic than the situation required, but not to the extent that we can conclude

that the court exceeded its "inherent discretionary powers to control proceedings . . . ." (Internal quotation marks omitted.) *State* v. *Eastwood*, 83 Conn. App. 452, 470, 850 A.2d 234 (2004), cert. denied, 286 Conn. 914, 945 A.2d 978 (2008). Our review of the transcript reveals several instances of the court harshly directing defense counsel to hasten the speed of his questioning in the presence of the jury. The record also reflects, however, that the court attempted to address defense counsel's speed during questioning early and often, and *outside* the presence of the jury. Although perhaps the court should not have been so candid and severe in addressing defense counsel, those instances, when considered in context, were not so "caustic and disparaging" to lead to the conclusion that the court "improperly interfered with defense counsel's cross-examination of witnesses and presentation of the evidence." On the contrary, the court allowed defense counsel ample time to complete cross-examination and to present evidence; it also granted his requests to comprehensively argue objections outside the presence of the jury on fifteen separate occasions. We conclude that the court's actions did not prejudice the defendant or deprive him of a fair trial, and, thus, the court properly denied the motion for a mistrial.

### III

Third, the defendant claims that he was deprived of his right to a fair trial as a result of prosecutorial impropriety. Specifically, the defendant claims that during cross-examination and closing argument, the prosecutor engaged in character assassination of the defendant and improperly appealed to the emotions of the jury, depriving him of his fifth and fourteenth amendment due process rights. We disagree.

We begin by setting forth the applicable standard of review regarding claims of prosecutorial impropriety.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged[ly] [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Melendez*, 291 Conn. 693, 714–15, 970 A.2d 64 (2009).

An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id.

"In making the determination as to whether the prosecutor's conduct constituted impropriety, [w]e are mind-

ful . . . of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Luther*, 114 Conn. App. 799, 810–11, 971 A.2d 781 (2009).

## A

The defendant first claims that the prosecutor improperly appealed to the emotions of the jury when questioning the defendant during cross-examination. With respect to the sexual assault charges, the complainant had testified that sex with the defendant was not consensual. The defendant had testified in response that sex with the complainant was consensual. During cross-examination of the defendant, the prosecutor asked about the events leading to the sexual act:

"[The Prosecutor]: Okay, and then did you put . . . anything into [complainant's] vagina?

"[The Defendant]: Yes.

"[The Prosecutor]: What?

"[The Defendant]: My penis.

"[The Prosecutor]: Okay, and when you did that, were you wearing a condom?

"[The Defendant]: No, sir.

"[The Prosecutor]: No. You are not married to this lady; aren't you afraid of bringing home a sexually transmitted disease to your wife?

"[Defense Counsel]: Objection, Your Honor.

"[The Prosecutor]: Yes or no?

"[Defense Counsel]: Objection, Your Honor, argumentative."

The court sustained the objection.[13]

It is well settled that prosecutorial impropriety may occur during the cross-examination of witnesses. *State* v. *Williams*, supra, 204 Conn. 538–39. We have reviewed the record and are unable to ascertain a valid purpose for asking the defendant about exposing his wife to a sexually transmitted disease.[14] Our Supreme Court has instructed that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 554–55, 949 A.2d 1092 (2008). Put another

---

[13] Defense counsel requested that the question be stricken from the record, and the court responded that it would not strike the question because the objection was sustained and no evidence was admitted. The court also stated that the jury had been instructed many times that a question asked by counsel is not evidence.

[14] In its appellate brief, the state argued solely that no impropriety occurred because the court sustained the defendant's objection.

way, "although a prosecutor may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 459, 832 A.2d 626 (2003).

Even if we assume that such a question constituted impropriety, we nevertheless conclude that any such impropriety was harmless and that the defendant was not deprived of a fair trial.[15] The question regarding the defendant's wife was an isolated incident, not central to the state's case, and the court immediately sustained defense counsel's objections. After applying the *Williams* factors and in light of the jury's finding of not guilty on the charges pertaining to the sexual assault, we conclude that the defendant was not deprived of a fair trial.

## B

Next, we address the defendant's claim that the prosecutor inappropriately characterized the defendant and, therefore, improperly appealed to the emotions of the jury, during closing arguments.

Because the claimed prosecutorial impropriety occurred during closing arguments, we advance the following legal principles. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and

---

[15] See *State* v. *Grant*, 286 Conn. 499, 542, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Collazo*, 113 Conn. App. 651, 670, 967 A.2d 597, cert. denied, 293 Conn. 904, 976 A.2d 705 (2009).

In closing argument, the prosecutor referred to evidence that the defendant failed to pay taxes in the course of his business and that he provided alcohol to a minor. In his rebuttal closing argument, the prosecutor commented on the defendant's marital infidelity. Finally, the prosecutor referred to the defendant as a "rapist . . . ." The defendant claims that each of these instances constitutes prosecutorial impropriety. We address each claim in turn.

First, during closing argument, the prosecutor commented on the defendant's failure to pay taxes.[16] This argument was fairly based on the evidence. Earlier, during cross-examination, when asked by the prosecutor whether he declared income with the state for the sales of his business, the defendant first laughed and then admitted that he did not. Next, also during closing argument, the prosecutor argued that the defendant "does not worry about giving alcohol to minors." This also was fairly based on the evidence. The defendant testified that he bought drinks for a friend named Jesus Gonzalez. Gonzalez testified at trial that he was nineteen years old on the day that the defendant provided him with alcohol. Defense counsel did not object on either occasion.

We have held that "[a] prosecutor may properly comment on the credibility of a witness where . . . the

---

[16] Specifically, the prosecutor said: "He'll do whatever he wants to do whenever he wants to do it. He doesn't have to pay taxes for his merchandise."

comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luther*, supra, 114 Conn. App. 812. These statements by the prosecutor were an expression of what the jury reasonably could infer from the evidence presented at trial. The charges in this case were based largely on conflicting testimony, and the credibility of all of the witnesses, including the defendant, was of the utmost importance. Therefore, we conclude that the prosecutor's references to the defendant's failure to pay taxes and serving drinks to a minor were not improper.

Next, during rebuttal closing argument, the prosecutor stated that "defense counsel brought up the fact that [the defendant] is an upstanding, married man with children. How do you think his wife and family feel?" He also argued that the defendant cheated on his wife. Defense counsel did not object to either statement. In fact, defense counsel argued in his closing argument that the complainant was not credible and had lied under oath, and that the defendant was credible, in part because he "is a businessman" and "has a wife." The prosecutor reasonably responded to the defense counsel's argument relating to the veracity of the defendant's testimony, and his argument was an expression of what the jury reasonably could infer from evidence that was admitted properly. Therefore, the prosecutor's references to the defendant's infidelity were not improper.

Finally, during rebuttal closing argument, the prosecutor referred to the defendant as a "rapist . . . ." Defense counsel objected to the use of the term. At defense counsel's request, the court instructed the jury as follows: "There was an inappropriate comment made by [the prosecutor] during his closing argument when he referred to [the defendant] as a rapist and whether you'd want a rapist or essentially the defendant living in your neighborhood. And as I believe I told you, the

arguments of counsel are not in evidence. They are provided to assist you in interpreting the evidence, but [they are] not evidence, and that inappropriate characterization should play no role in your deliberations."[17]

During oral argument before this court, the state conceded that the use of the term "rapist" was improper, and we agree. We do not countenance the use of such inappropriate and inflammatory language. In applying the *Williams* factors to the improper use of the word "rapist" by the prosecutor, however, we conclude that it did not deprive the defendant of a fair trial. First, the court gave a strong curative instruction to the jury. Also, although the comment was central to an issue in the case, the defendant was acquitted of all charges related to the alleged sexual assault. In addition, the impropriety only occurred once, and the state's case on the charges of interfering with an officer, the only charges of which the defendant was convicted, was strong and included the testimony of five Bridgeport police officers. In light of the entire trial record and the application of the *Williams* factors, the isolated use of the term "rapist" did not deprive the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] This instruction was made in addition to the following more general instruction: "[T]here are certain things that are not evidence, and you may not consider them in deciding what the facts are. These include arguments and statements by the lawyers. The lawyers are not witnesses. What they've said in their closing arguments or in their long narrative questions that you heard during this trial is not evidence. Now, what you heard in their closing arguments is intended to help you to interpret the evidence, but it is not evidence."